EDMUND G. BROWN JR.
Attorney General of the State of California
J. MATTHEW RODRIQUEZ
Chief Assistant Attorney General
MARK J. BRECKLER
Senior Assistant Attorney General
MARTIN GOYETTE (SBN 118344)
Supervising Deputy Attorney General
GARY ALEXANDER (SBN 167671)
JOSHUA SONDHEIMER (SBN 152000)
JULIA Y. JE (SBN 192746)
ANNADEL A. ALMENDRAS (SBN 192064)
Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
    Telephone:  (415) 703-5565
    Fax:  (415) 703-5480
    E-mail:  Annadel.Almendras@doj.ca.gov

Attorneys for Plaintiff California Department of
Water Resources, by and through its California
Energy Resources Scheduling Division

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF WATER RESOURCES,<br><br>                  Plaintiff,<br><br>    v.<br><br>POWEREX CORP., a Canadian Corporation, dba POWEREX ENERGY CORP.,<br><br>                  Defendants. | Case No.  2:05-CV-00518 GEB EFB<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff CALIFORNIA DEPARTMENT OF WATER RESOURCES, by and through its California Energy Resources Scheduling Division, and acting solely under the authority and powers created by California Assembly Bill 1 of the First Extraordinary Session of 2001-2002 (codified in sections 80000 through 80270 of the California Water Code) (referred to as "DWR" or "Plaintiff" or "Plaintiff DWR") alleges as follows:

**NATURE OF ACTION**

1. During the California energy crisis of 2000-2001, "the California Energy market was subjected to artificial manipulation on a massive scale." (*Calif. ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1015-1016 (9th Cir. 2004)). Defendant POWEREX CORP. ("POWEREX" or Defendant) was one of the market manipulators. As a result of this manipulation, California faced an unexpected and severe energy shortage in 2000 and 2001.

2. Due to the state of emergency created by the energy crisis, the State of California, through DWR, was compelled to enter into numerous energy transactions with POWEREX. The majority of transactions between DWR and POWEREX were made on a real-time basis, with the energy needed to satisfy demand for electricity within less than an hour from when the transactions were finalized. During this crisis, DWR had no reasonable alternative but to transact with POWEREX to procure needed energy for California. POWEREX took an oppressive and unfair advantage of the distress created by the California energy crisis, the necessities which compelled DWR to procure sufficient energy to avoid blackouts, and POWEREX's own participation in and knowledge of energy market manipulation. DWR's agreements to the terms of the transactions with Powerex were not real, mutual, or free. Moreover, the transactions are contrary to the public policy and public interest of the State of California.

3. Pursuant to *Grays Harbor v. Idacorp,* 379 F.3d 641 (9th Cir. 2004), DWR seeks a declaration that all of the contracts or transactions with POWEREX from January 17, 2001, through December 31, 2001, are void and of no force and effect, and any determination as to the amount of monetary relief involving issues of just, reasonable or fair rates would be addressed to the Federal Energy Regulatory Commission ("FERC").

**PARTIES**

4. Plaintiff DWR is, and at all relevant times alleged in this Amended Complaint was, an agency of the State of California with its principal offices in Sacramento, California. At all times mentioned in this Amended Complaint, DWR acted by and through its California Energy Resources Scheduling Division, solely under the authority and powers created by

California Assembly Bill 1 of the First Extraordinary Session of 2001-2002 (codified in sections 80000 through 80270 of the California Water Code).

5. Defendant POWEREX CORP. is a Canadian corporation headquartered in Vancouver, British Columbia, Canada. POWEREX is the wholly-owned power marketing subsidiary of BC Hydro, Canada's third largest electric utility. At all relevant times alleged in this Amended Complaint, POWEREX was and is a marketer of wholesale energy products and services and was and is engaged in energy merchant and commodity market businesses and trading activities in western Canada and the western United States, including California.

6. The true names and capacities of defendants sued in this Amended Complaint under fictitious names of DOES 1 through 100, inclusive, are unknown to Plaintiff, who sues such defendants by such fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously-named defendants engaged in or is otherwise responsible in some manner for the acts, omissions, misrepresentations, use or misuse of information or other occurrences alleged herein. Plaintiff will amend its Amended Complaint to state the true names of those fictitiously named defendants as and when they become known to Plaintiff.

7. Unless otherwise alleged, whenever reference is made in this Amended Complaint to any act of defendants, such allegation shall mean that each defendant acted individually and jointly with the other defendants named in the Amended Complaint.

8. Unless otherwise alleged, whenever reference is made in this Amended Complaint to any act of POWEREX or any corporate or other business defendant, such allegation shall mean that POWEREX or such corporation or other business did the acts alleged in this Amended Complaint through its officers, directors, employees, agents and/or representatives who were acting within the actual or ostensible scope of their authority.

9. At all relevant times alleged in this Amended Complaint, each of the defendants has acted as an agent, representative, or employee of each of the other defendants and has acted within the course and scope of their actual or ostensible authority.

///

///

**JURISDICTION**

10. The United States Court of Appeals for the Ninth Circuit held in a decision issued on July 22, 2008 that jurisdiction exists under 28 U.S.C. §§ 1441(d) and 1603.

11. Defendant POWEREX is a Canadian corporation registered with the California Secretary of State to conduct business in California and did conduct business in California by engaging in numerous energy transactions with DWR, including the offer and sale of electricity in the State of California and/or the control area of the California Independent System Operator ("ISO").[1] POWEREX otherwise has sufficient minimum contacts in California to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

**VENUE**

12. Venue is proper in this district under 28 U.S.C. § 1441(a) because this action was brought in the Superior Court of the State of California, County of Sacramento, and has been removed by POWEREX to this Court and division, which embraces the place where this action was pending.

**FACTS**

**A.   Deregulation of California's Electric Generation Market**

13. Prior to restructuring of the electricity industry in California, the State's major investor-owned utilities ("IOUs"), namely Pacific Gas & Electric Company ("PG&E"), Southern California Edison ("SCE"), and San Diego Gas & Electric Company ("SDG&E"), provided bundled services for electricity, including generation, transmission, and distribution, to the majority of retail customers in the state. In September 1996, the California Legislature enacted Assembly Bill 1890 ("AB 1890"), with the goal of introducing competition through deregulation in the generation and sale of electricity, at both the wholesale and retail levels.

---

[1] / The California Independent System Operator ("ISO") is a not-for-profit corporation established through California legislation for the deregulation of the energy markets. The ISO is responsible for operating the high-voltage transmission grid serving most of California. The area encompassing this transmission grid is known as the ISO control area.

14. AB 1890 also established two new institutions to manage important aspects of the wholesale power market: the California Power Exchange ("PX") and the California Independent System Operator ("ISO").

15. The PX was established to operate two auction-style markets for the purchase and sale of electricity for delivery during the same or next day. These were the "day-ahead" and "day-of" markets. The intent of the deregulation plan was that 95 percent of the power needed to serve customers in the ISO control area would be sold and purchased through the PX markets.

16. The ISO was established to operate the high-voltage transmission grid serving most of the state and is responsible for all real-time operations, such as continuously balancing generation and load and managing congestion on the transmission system it controls. The ISO also administers a variety of auction markets for the purpose of procuring the electricity necessary to operate the transmission system reliably. These markets included an energy market to procure the power needed to continuously match the amount of power being supplied to the grid with the amount of energy being demanded by customers on a real-time basis. This market is known as the "real-time" energy market or the "imbalance" energy market.

17. Neither the ISO nor the PX purchased or sold energy for their own accounts or benefit. Rather, they served as "market-makers" or clearinghouses to facilitate the sale and purchase of wholesale power by market participants such as POWEREX. In markets administered by the PX and ISO, sellers submitted bids specifying the amount of electricity and/or capacity they wished to sell and the price at which they were offering to sell. The auction operator ranked all bids in merit order (i.e., from lowest to highest price), and then selected all of the bids it needed in order to meet the demand for energy in a given time interval. The bid submitted by the highest priced unit selected set a single "market-clearing price" that all buyers paid, and all sellers received. At all relevant times alleged in this Amended Complaint, all of the ISO and PX-operated markets were subject to price caps.

18. In order to maintain balance on the transmission grid, the ISO would dispatch power from sellers that submitted successful bids in the imbalance energy market. If there were insufficient bids in the ISO imbalance energy market to meet customer demand in real-time, the

ISO, as a last resort, would purchase energy "out-of-market" (OOM) in order to procure the resources necessary to operate the system reliably.

### B. The Breakdown of the Market, Skyrocketing Electricity Prices, and Rolling Blackouts

19. In May 2000, the price of wholesale power began to quickly rise to historically unprecedented levels in California. Moreover, the volume of energy bid into the PX and ISO markets diminished drastically, resulting in an insufficient supply of energy to satisfy demand. The crisis that ensued wreaked havoc in California well through the summer and fall of 2000 and did not subside until the fall of 2001. The 2000-2001 period of unprecedented energy prices and energy shortages is commonly referred to as the California energy crisis.

20. During the energy crisis, for the first time ever in California history, businesses and residents in the State were subjected to rolling blackouts. Attendant with these blackouts and the continuous threats of power outages were the risks of catastrophic consequences to the health, safety, and welfare of the people of the State of California. The crisis further posed a serious threat to the safety and reliability of the high voltage transmission grid serving the State, which was subjected to extended periods of ISO-declared system emergencies in which operating reserves fell below system requirements. The ISO declared numerous Stage 3 system emergencies (the highest level of system emergency) because actual or anticipated operating reserves were less than or equal to one and a half percent (1½%) of projected peak demand.

21. The two largest IOUs, SCE and PG&E, incurred enormous debts and, as a result, defaulted on payments to both the PX and the ISO. PG&E filed for bankruptcy in April 2001, and SCE teetered on the brink of bankruptcy. On January 29, 2001, the PX suspended trading in its markets, effectively ceasing its operations, and declared bankruptcy on March 9, 2001.

### C. DWR's Authority to Enter into Energy Transactions

22. On January 17, 2001, Governor Gray Davis declared a state of emergency in order to ensure that a continuous supply of energy was available in California. Governor Davis authorized the State, through DWR, to purchase electricity to protect the health, safety, and vital economic interests of California citizens and businesses.

23. California's energy crisis required decisive action and unprecedented dedication of State resources. Meeting in emergency session in January 2001, the California Legislature passed Assembly Bill 1 of the 2001-2002 First Extraordinary Session ("AB 1X"), which took effect on or about February 1, 2001.[2] This was comprehensive legislation charging DWR with the task of procuring energy to provide California consumers with a stable supply of electricity. The Legislature's findings and declarations in enacting AB 1X included the following:

> The furnishing of reliable reasonably priced electric service is essential for the safety, health, and well-being of the people of California. A number of factors have resulted in a rapid, unforeseen shortage of electric power and energy available in the state and rapid and substantial increases in wholesale energy costs and retail energy rates, with statewide impact, to such a degree that it constitutes an immediate peril to the health, safety, life and property of the inhabitants of the state, and the public interest, welfare, convenience and necessity require the state to participate in markets for the purchase and sale of power and energy.

Cal. Water Code § 80000(a).

24. For several months after Governor Davis declared a state of emergency and DWR assumed the role of purchasing electricity to avoid rolling blackouts, DWR was in constant contact with the ISO. On an hourly basis, and often more frequently, the ISO apprized DWR of the real-time electricity needs to balance the electrical grid and ensure the reliability of the system. Energy marketers were not bidding into the PX or ISO markets, and many marketers refused to transact out-of-market with the ISO. Consequently, DWR was forced to negotiate energy transactions outside of the regulated markets to purchase thousands of megawatts of electricity, often on an immediate basis, in order to meet the real-time energy needs in the ISO control area.

///

///

---

[2]/ AB 1X is codified in Division 27 of the California Water Code, §§ 80000 - 80270. Prior to the effective date of AB 1X, DWR made emergency purchases of needed electricity for the benefit of the public pursuant to authority conferred by Senate Bill 7 of the 2001-2002 First Extraordinary Session ("SB 7X"), which was codified in section 200 of the California Water Code.

### D. POWEREX's Participation in Manipulation of the California Energy Markets

25. In May 2002, approximately two years after the start of the California Energy Crisis, DWR first learned of what has since become known as Enron-style gaming, when Enron Corporation released memoranda detailing various games and trading strategies it and its traders used to manipulate the California energy markets. The public did not learn until much later, however, about the extent of the market manipulation, and that the manipulation and gaming activities by energy marketers, including POWEREX, were a significant factor in the cause of the energy crisis.

26. POWEREX manipulated the California energy markets through Enron-style gaming and trading strategies. At the time DWR entered into numerous transactions with POWEREX, many sellers, including POWEREX, claimed that the energy crisis was caused by "market fundamentals" and claimed that California had simply failed to build power plants to meet increasing demand. POWEREX asserted that California's power shortage was "self-inflicted," and denied it had artificially created shortages and manipulated markets. DWR lacked any knowledge of POWEREX's involvement in manipulation of the California energy markets and its use of these trading strategies. Moreover, DWR lacked the opportunity or means to obtain such knowledge until after August 2002, when the United States Court of Appeals for the Ninth Circuit ordered the Federal Energy Regulatory Commission ("FERC") to allow parties involved in its proceedings addressing the California Energy Crisis to engage in discovery into market manipulation by energy producers and marketers, including POWEREX.

27. POWEREX knew of manipulation of the California energy markets and participated in that manipulation to create artificial energy shortages. As a result of the market manipulation, DWR had no alternative but to enter into numerous transactions with POWEREX to procure sufficient electricity to supply demand in California. DWR's apparent consent to the terms in each of the transactions with POWEREX was not real, mutual, or free in that it was obtained through duress and undue influence as herein alleged.

E.  **DWR's Transactions with POWEREX**

28. As a result of the dysfunction of California's energy markets, insufficient energy was available through the ISO real-time market to satisfy the immediate needs to balance the grid and operate the system reliably.  By January 2001, numerous energy marketers, including POWEREX, refused to supply energy to California through the PX or ISO energy markets.  Moreover, POWEREX and other energy marketers refused to negotiate real-time, out-of-market transactions with the ISO.  POWEREX insisted that any transactions to supply electricity to California must be conducted with DWR out-of-market.

29. Beginning on January 17, 2001, DWR stepped in to procure all of the energy needed in real-time to balance the grid and ensure reliability.  The ISO would at times demand that DWR procure more than one thousand megawatts (1,000 MW) to supply the grid by the end of the hour.  These were intense and stressful situations because the ISO was relying on DWR to procure sufficient OOM energy to maintain grid reliability and avoid blackouts.  After canvassing various marketers, with only a limited amount of time to procure the electricity, DWR often found few marketers to supply sufficient energy to satisfy the real-time needs of the system.

30. While other energy marketers could provide only limited power to DWR to satisfy the real-time needs of the ISO system at any given hour, POWEREX had access to extensive hydroelectric resources which could supply large volumes of energy.  Indeed, at all relevant times alleged in this Amended Complaint, POWEREX was one of the largest, if not the largest, suppliers of real-time power to several locations within the ISO control area.  During many hours, no other energy marketer was able to supply the large volumes of real-time electricity as POWEREX did.  Consequently, DWR was compelled to enter into numerous out-of-market transactions with POWEREX in order to obtain sufficient energy to satisfy the real-time energy needs and maintain the reliability of the ISO energy grid.

31. From January 17, 2001 through December 31, 2001, DWR and POWEREX transacted thousands of OOM purchases.  Although DWR had negotiated several long term contracts with other energy marketers by the summer of 2001, the energy provided under

1  contracts in effect at that time still was not sufficient to satisfy the real-time energy needs to
2  maintain ISO grid reliability.  Therefore, the ISO continued to request that DWR procure
3  real-time energy through the summer and fall of 2001.

4       32.    In addition to energy purchases, DWR also engaged in numerous exchange
5  transactions with POWEREX.  An exchange of energy is a transaction whereby an out-of-market
6  supplier agrees to deliver a requested amount of electricity to a counter-party in return for the
7  counter-party's promise to provide an equal or greater volume of power in the future.

8       33.    Subsequent to the issuance of an order by the Federal Energy Regulatory
9  Commission on June 19, 2001, requiring price mitigation in the California markets, POWEREX
10  at times advised DWR that it could not sell energy to California at mitigated prices.  In some
11  instances, POWEREX insisted that energy transactions with DWR be by exchanges of energy,
12  frequently at a 2.5:1 ratio.  Under the terms of these exchange transactions, DWR returned two
13  and a half megawatts (2.5 MW) of electricity to POWEREX for every one megawatt (1 MW)
14  POWEREX provided to DWR.  Because DWR still had few alternatives for supplies of energy,
15  DWR had no choice but to deal with POWEREX.

16       34.    At all relevant times alleged in this Amended Complaint, DWR performed all of
17  its obligations in these transactions and in all other transactions with POWEREX.  DWR was
18  compelled to comply with all terms of its transactions with POWEREX in order to ensure a
19  supply of energy for California during the Energy Crisis.

20       35.    At all relevant times alleged in this Amended Complaint, POWEREX was aware
21  of and participated in the market manipulation and market gaming that resulted in the California
22  Energy Crisis.  The manipulation and gaming activity tended to tighten the supply of electricity
23  in the California energy markets.  The tightening of supply was part of a larger plan that allowed
24  marketers, including POWEREX, to give the appearance of a shortage of supply in the markets.

25       36.    POWEREX was further aware that no other energy marketers were able to supply
26  DWR with large volumes of energy and that POWEREX was DWR's only option in its efforts to
27  help the ISO maintain grid reliability and avoid blackouts.

28

## FIRST CAUSE OF ACTION

**(Declaratory Relief: Duress)**

37. DWR realleges and incorporates by reference paragraphs 1 through 36 inclusive as if fully set forth herein.

38. As a result of POWEREX's knowledge of manipulation of the California energy markets, its participation in the market manipulation, and the ensuing energy crisis, and DWR's relative lack of knowledge, DWR had few alternatives and was compelled to procure energy from POWEREX in order to secure sufficient energy for California. DWR seeks a declaration that each of the transactions with POWEREX from January 17, 2001, through December 31, 2001, are the result of duress and are void and of no force and effect.

WHEREFORE, DWR prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

**(Declaratory Relief: Undue Influence)**

39. DWR realleges and incorporates by reference paragraphs 1 through 38 inclusive as if fully set forth herein.

40. POWEREX was aware of DWR's acute needs to procure large volumes of energy during the energy crisis to avoid blackouts. DWR lacked full knowledge at the time of the extent and nature of manipulation of the California energy markets, including manipulation by POWEREX, and that the extreme energy shortages were artificial. POWEREX knew of and participated in the market manipulation and took unfair advantage of DWR under these circumstances. DWR seeks a declaration that each of the transactions with POWEREX from January 17, 2001, through December 31, 2001, are the result of undue influence and are void and of no force and effect.

WHEREFORE, DWR prays for judgment as set forth below.

///

///

///

## THIRD CAUSE OF ACTION

**(Declaratory Relief: Contract Contrary to Public Policy and Interest)**

41. DWR realleges and incorporates by reference paragraphs 1 through 40 inclusive as if fully set forth herein.

42. California Civil Code section 1689(b)(6) provides that "[a] party to a contract may rescind the contract . . . [i]f the public interest will be prejudiced by permitting the contract to stand."

43. The transactions between POWEREX and DWR, if allowed to stand, would prejudice the public interest and frustrate public policy within the meaning of Civil Code section 1689(b). At all relevant times alleged in this Amended Complaint, DWR had an interest and obligation to furnish reliable electric service to California consumers and to prevent risks of catastrophic consequences to the health, safety and welfare of the people of the State of California. In addition, California has a legitimate and compelling interest in protecting consumers from, and preserving a business climate free of unscrupulous business practices. The public interest and/or policy will be prejudiced by permitting the contracts between POWEREX and DWR to stand, as the contracts are the product of market manipulation and deception. DWR therefore seeks a declaration that each of the transactions with POWEREX from January 17, 2001, through December 31, 2001, are contrary to public policy and interest and are void and of no force and effect.

WHEREFORE, DWR prays for judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff DWR prays for judgment against Defendant POWEREX as follows:

1. For a declaration that the transactions between Plaintiff and Defendant are void and of no force or effect;

2. For an order awarding Plaintiff its costs of suit herein;

///

///

3.     For such other and further relief as the nature of the case may require and the court deems appropriate and just.

DATED:  September 22, 2008

EDMUND G. BROWN JR.
Attorney General of the State of California
J. MATTHEW RODRIQUEZ
Chief Assistant Attorney General
MARK J. BRECKLER
Senior Assistant Attorney General
MARTIN GOYETTE
Supervising Deputy Attorney General
GARY ALEXANDER
JOSHUA SONDHEIMER
JULIA Y. JE
ANNADEL A. ALMENDRAS
Deputy Attorneys General


By: /s/  Annadel A. Almendras
    ANNADEL A. ALMENDRAS
    Deputy Attorney General

Attorneys for Plaintiff California Department of Water Resources, by and through its California Energy Resources Scheduling Division