IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA DEPT. OF WATER RESOURCES)
                                    )
            Plaintiff,              )    2:05-cv-00518
                                    )
       v.                           )    ORDER
                                    )
POWEREX CORP.,                      )
                                    )
            Defendant.              )
_____)

        On August 17, 2009, a hearing was held on Defendant Powerex
Corp.'s ("Powerex") motion for a stay or dismissal of this action,
based on the argument that the California Attorney General ("CAG") has
recently caused all issues involved with Plaintiff California
Department of Water Resources' ("CDWR") state claims in this federal
district court case to be pending at the Federal Energy Regulatory
Commission ("FERC").  Specifically, Powerex argues CDWR's three state
claims in this federal court case all require a finding on "the
predicate act" whether Powerex engaged in illegal market manipulation,
which Powerex contends is the same issue squarely before FERC today.
CDWR opposes the motion, arguing FERC will not reach the issues CDWR
seeks to have determined in this federal district court case.

1

<u>BACKGROUND</u>

CDWR, "by and through its California Energy Resources Scheduling Division" ("CERS"), filed its Second Amended Complaint ("SAC") in this federal court case on September 22, 2008. (SAC Preface.)  CDWR alleges in the SAC that the following occurred "during the California energy crisis of 2001":

> [T]he California Energy market was subjected to artificial manipulation on a massive scale. (<u>Calif. ex rel. Lockyer v. FERC</u>, 383 F.3d 1006, 1015-1016 (9th Cir. 2004)). *[Powerex] was one of the market manipulators. As a result of this manipulation, California faced an unexpected and severe energy shortage in 2000 and 2001.*  Due to the state of emergency created by the energy crisis, the State of California, through [C]DWR, was compelled to enter into numerous energy transactions with Powerex. The majority of transactions between [C]DWR and Powerex were made on a real-time basis, with the energy needed to satisfy demand for electricity within less than an hour from when the transactions were finalized.  During this crisis, [C]DWR had no reasonable alternative but to transact with Powerex to procure needed energy for California. *POWEREX took an oppressive and unfair advantage of the distress created by the California energy crisis, the necessities which compelled [C]DWR to procure sufficient energy to avoid blackouts, and POWEREX's own participation in and knowledge of energy market manipulation.* [C]DWR's agreements to the terms of the transactions with Powerex were not real, mutual, or free.  Moreover, the transactions are contrary to the public policy and public interest of the State of California.
>
> Pursuant to <u>Grays Harbor v. Idacorp</u>, 379 F.3d 641 (9th Cir. 2004), [C]DWR seeks a declaration that all of the contracts or transactions with Powerex from January 17, 2001, through December 31, 2001, are void and of no force and effect, and *any determination as to the amount of monetary relief involving issues of just, reasonable or fair rates would be addressed to [FERC].*

(SAC ¶¶ 1-3) (emphasis added).  CDWR argues the contracts and transactions are void because CDWR entered them under "duress," "undue influence" and "contrary to [California] public policy and interest" as

a result of having been subjected to Powerex's "participation in . . . energy market manipulation."   (SAC ¶¶ 2, 37-43.)

The CAG argues in his Complaint at FERC ("FERC Complaint"), filed on behalf of the People of the State of California, that he is giving FERC "in first instance an opportunity to enforce the [Federal Powers Act] and remedy [energy]sales to CERS," which is a division of CDWR. (FERC Compl. 2, 56; SAC Preface) (internal quotations omitted). The FERC Complaint is alleged against Powerex and 18 other "public utility sellers of short term bilateral energy to [CERS] during the period January 18, 2001 to June 20, 2001 that have not settled their refund liability with the [CAG]." (FERC Compl. 2.)  The FERC Complaint states the following:

> *The [CAG] seeks refunds for California ratepayers on sales to CERS because those sales were made at unreasonable and unjust prices.* These unjust and unreasonable prices resulted from: (1) [FERC]'s regulatory failure to protect ratepayers; and (2) sellers' violation of applicable tariffs, exercise of undue market power in California's electricity markets, manipulation of those markets through withholding and other abusive market schemes, and failure to comply with market-based rate oversight requirements . . . [The CAG argues FERC] should order sellers [both tariff violators as well as situational beneficiaries] *to pay refunds on all short-term bilateral sales to CERS that were priced at unjust and unreasonable levels* as measured by application of the mitigated market clearing price ("MMCP")[1] methodology that [FERC] has already adopted in the California Refund Proceeding.[2]

---

[1] MMCP is the "methodology established by FERC in its July 25, 2001 Order, as subsequently modified, to calculate just and reasonable rates for all sales in the [California Independent System Operator Corporation ("ISO") and the California Power Exchange ("PX")] markets in place of unjust and unreasonable rates that were charged.  Jurisdictional sellers are required to refund amounts collected above the MMCP."  (FERC MTC vii.)

[2] "The California Refund Proceeding was established by FERC in a
(continued...)

(FERC Compl. 2-3)(emphasis added.)

> Powerex also explains in its motion:

> [O]n May 22, 2009, the CAG, along with the Public
> Utilities Commission of California ("CPUC"),
> Pacific Gas and Electric Company ("PG&E"), and
> Southern California Edison Company ("SCE")
> (collectively the "California Parties") filed at
> FERC a motion to consolidate ["FERC MTC"] the
> concurrently-filed CAG [FERC] Complaint with three
> pre-existing "California Energy Crisis" proceedings
> now on remand at FERC from the Ninth Circuit "into
> one proceeding that will encompass all [claims for
> short-term sales] made by the California Parties
> for the Crisis Period and that will measure the
> total financial harm done to California
> ratepayers[.]"

(Def's Mot. 5:3-14) (internal citation omitted.) The California
Parties request the following in the FERC MTC, in which they also
request summary disposition, and urge the FERC to combine FERC
proceedings and issue expeditious relief:

> [T]hat [FERC] timely implement the mandates in the
> Remand Proceedings[3] and adjudicate the related [FERC
> Complaint] in a single, comprehensive proceeding,
> so as to provide full and expeditious relief to
> California consumers harmed by the Energy Crisis.
> Consolidation of these proceedings is necessary

---

[2](...continued)
previous FERC order, San Diego Gas & Elec. Co. v. Sellers of Energy and
Ancillary Serv. Into Markets Operated by the Cal. Indep. Sys. Operator
Corp. and the Cal. Power Exch., 96 FERC ¶ 61,120 (2001)." (FERC Compl.
3, n.7.)  This order dealt with determination of reasonable rates and
refunds related to transactions "in the spot markets operated by [ISO
and PX] during the period October 2, 2000 through June 20, 2001." Id.
This order also suggested exploration and investigation into whether
there were "unjust and unreasonable charges for spot market sales in the
Pacific Northwest from December 25, 2000 through June 20, 2001, and the
calculation of any refunds associated with such charges."

[3]  The Remand Proceedings are comprised of "three cases which [FERC]
has before it on remand from the Ninth Circuit concerning the 2000-2001
Energy Crisis." (FERC Compl. viii.)   These cases are California v.
Lockyer v. FERC, 383 F.3d 1006 (9th Cir. 2004), Public Utilities
Commission of California v. FERC, 462 F.3d 1027 (9th Cir. 2006), and Port
of Seattle, Washington v. FERC, 499 F.3d 1016 (9th Cir. 2007).

because these cases all involve the same issues,
parties, related markets, and requested relief.
*Consolidating all of these cases is the only lawful
way to ensure that the Ninth Circuit's mandates are
enforced and that the interrelated issues are
resolved based on a complete factual record.
Litigating the claims separately would not allow a
reasoned determination of the magnitude of
financial harm that California ratepayers suffered
during the Crisis. Piecemeal litigation also would
squander the resources of [FERC] and the parties
(and potentially the courts), would create
potentially inconsistent results, and would make it
more difficult for the parties to discuss global
settlements as an alternative to this
already-protracted litigation.*

(FERC MTC 5)(emphasis added).  The California Parties also

request in the FERC MTC:

[that FERC] *expand the already familiar MMCP remedy*
for sales during [October 2, 2000 through June 20,
2001, for which FERC ordered refunds of certain
transactions within the [California Independent
System Operator Corporation ("ISO") and the
California Power Exchange ("PX")] markets (the
"Refund Period") *to sales during the Summer Period
[May 1, 2000 - October 1, 2000], to excluded Refund
Period ISO/PX sales, and to short-term sales to
CERS. Market-wide relief in these circumstances is
supported by the law and necessary to ensure that
consumers are placed in the position that they
would have been in, had sellers' exercise of undue
market power, pervasive market manipulation, and
violations of tariff and market rules not destroyed
competitive market conditions.*

(FERC MTC 7)(emphasis added).

The California Parties also filed at FERC a Motion for

Refunds ("FERC MFR") on June 9, 2009, which includes the following

arguments:

[T]he California Parties file this motion to
recover refunds for sales made to CERS at prices
that exceeded the applicable cap during the
Relevant Period, almost all of which were made by
Powerex as energy exchanges.

*During the Relevant Period, [Powerex] sold
electricity to CERS at unjustified, and therefore
illegal, above-the-cap prices, primarily in the*

*form of energy exchange transactions but also in the form of cash transactions.  The California Parties seek refunds from [Powerex] and other sellers . . . .*

*Almost all of the unjustified and illegal above-the-cap sales to CERS were made by Powerex as exchange transactions.  Powerex's exchange sales to CERS during the Relevant Period illegally exceed the June 19 Order's cap limit by a total of $27,152,716.  Powerex's traditional cash sales to CERS exceeded the legal cap limit by an additional $318,972.  Powerex's total above-the-cap sales to CERS thus amounted to $27,471.688 . . . .*

*Accordingly, consistent with the Ninth Circuit's [Public Utilities Commission of California v. FERC] decision, [FERC] should enforce its prior orders and order [Powerex and other sellers] to refund the indicated above-the-cap overcharge principal amounts charged to and paid by CERS and direct the payment of interest at the FERC interest rate on all such above-the-cap charges . . . .*

*The June 19 Order imposed a $91.87 price cap on all sales . . . during the Relevant Period, including all sales to CERS.  Absent timely-filed cost justifications approved or deemed approved by [FERC], no generator or [loan-serving entities ("LSE")] could legally bill CERS an amount in excess of the cap price for electricity transactions, and no marketer was permitted to charge CERS a price above the cap under any circumstances.[4]  In light of the fact that no generator or LSE that sold to CERS at a price above the cap had [FERC] permission to do so,[5] no sale to CERS at a price above-the-cap was lawful. [FERC] thus should direct the sellers identified in this Motion to refund all such above-the-cap amounts to CERS, plus interest at the applicable FERC rate . . . .*

*Powerex, a marketer prohibited by [FERC] from even seeking authority to sell at prices above-the-cap, made the vast majority of above-the-cap sales to CERS.  Almost all of these sales were exchange transactions, which were either repaid by CERS in-kind or were "monetized" and ultimately paid for in cash . . . .*

---

[4] June 19 Order, 95 FERC at ¶ 62,563-64, ¶ 62,568.

[5] September 7 Order, 96 FERC at ¶ 62,002; October 5 Order, 97 FERC at ¶ 61,053.

During the Relevant Period, Powerex sold CERS 140,041 MWh of electricity in transactions that began as in-kind energy exchanges but were later monetized. As CERS scheduler Susan Lee explains in her attached declaration, Powerex demanded repayment of these exchanges within a very short period of time (3-4 days), and when CERS was unable to acquire sufficient energy to repay Powerex in-kind within the time required, Powerex dictated a cash price that it charged CERS instead. Comparing the $91.87 price cap to the monetized return payment demanded by Powerex, Dr. Berry calculates that Powerex's illegal monetized above-the-cap charges to CERS totaled $21,267,843 . . . .

The refunds requested in this Motion for unlawful above-the-cap sales made to CERS by the above-specified sellers during the Relevant Period are in addition to, and unrelated to, refunds sought by the California Parties in other proceedings before [FERC] for sales made to CERS. The CERS refunds sought here relate to a different time period (post-June 19, 2001) and a different set of transactions than the pre-June 20, 2001 transactions for which the California Parties seek CERS refunds in other proceedings before [FERC]. The refunds sought here are owed to CERS no matter how [FERC] rules in those other proceedings. The refunds sought here are not connected with any issue regarding "who-owes-what-to-whom?" or amounts that are being held in those other proceedings. Because calculation of these refunds for sellers' unlawful above-the-cap sales during the Relevant Period can occur quickly and without reference to calculation of refunds due CERS for other sales, the California Parties request that [FERC] order the sellers to immediately pay these refunds to CERS, with interest at the FERC interest rate.

(FERC MFR 3-11)(emphasis added).

DISCUSSION

Powerex argues the FERC Complaint, the FERC MTC, and the FERC MFR (collectively, the "FERC filings") reveal the issues before this Court are now squarely before FERC, and therefore, this federal court case should be stayed. CDWR counters this argument is unavailing since it is not a Plaintiff in any of the FERC filings. The FERC filings do not support CDWR's position. Each FERC filing

seeks relief on behalf of CERS, and CDWR states its SAC is "by and through its [CERS] Division." (SAC Preface.)   In the FERC Complaint, "the [CAG] seeks refunds for California ratepayers on sales to CERS because those sales were made at unreasonable and unjust prices." (FERC Compl. 2).   The California Parties' FERC MTC asks FERC to "expand the already familiar MMCP remedy . . . to short-term sales to CERS." (FERC MTC 7.)   The California Parties also seek in the FERC MFR "to recover refunds for sales made to CERS at prices that exceeded the applicable cap during the Relevant Period . . . ." (FERC MFR 3.) Thus CDWR is clearly involved with the FERC filings through its CERS division, since each filing indicates CERS would benefit from any refund awarded by FERC.

Powerex also argues the same remedies and monetary relief sought in the SAC are sought at FERC.  Further, Powerex argues the "monetary remedies available under the [Federal Powers Act]" concerning "'just and reasonable rates'" or "disgorgement of profits for violations of statute or [FERC]-approved tariffs" remain the same regardless of where relief is sought. (Def's Reply 13:9-14:6.) CDWR counters that the amount of monetary recovery it could seek from FERC will be greater if the challenged transactions or contracts in the SAC are declared invalid. (Pl.'s Opp'n 1:24-27.)  CDWR acknowledges, however, in its SAC that "any determination as to the amount of monetary relief involving issues of just, reasonable or fair rates would be addressed to [FERC]". (SAC ¶ 3.)

Powerex and CDWR also clash on whether the FERC filings involve the same market manipulation allegations which are the basis of CDWR's contract formation claims before this Court.  CDWR argued at the hearing that each of its claims in this federal court case is

based on California public policy. (Transcript of Hearing at 5-13.)
Each claim in the SAC, however, incorporates by reference "market
manipulation" allegations, which CDWR virtually conceded at the
hearing are identical to the "market manipulation" claims in the FERC
filings, although it did argue some of their market manipulation
claims are different from what is at FERC.  Powerex rejoined that the
same market manipulation allegations are before FERC.  The CAG's FERC
Complaint seeks refunds from sellers based on "sellers' violation of
applicable tariffs, exercise of undue market power in California's
electricity markets, [and the sellers'] manipulation of those markets
through withholding and other abusive market schemes . . . ." (FERC
Compl. 2-3.)  The California Parties also argue in the FERC MTC that
their request for "[m]arket-wide relief . . . is . . . necessary to
ensure that consumers are placed in the position that they had been
in, *had sellers' exercise of undue market power, pervasive market
manipulation, and violations of tariff and market rules not destroyed
competitive market conditions*." (FERC MTC 7) (emphasis added).
Likewise, the California Parties argue in the FERC MFR that the relief
they seek is based on "[Powerex's] [sales of] electricity to CERS at
unjustified, and therefore illegal, above-the-cap prices . . . ."
(FERC MFR 3.)

CDWR failed to controvert Powerex's position that CDWR's
"market manipulation" allegations in its SAC are intertwined with the
"market manipulation" allegations against Powerex in the FERC filings.
Thus, based on these allegations, whether Powerex manipulated the
electricity energy market to artificially create the appearance of a
shortage of electric power is an issue germane to resolution of the
claims in the SAC and those pending at FERC.  CDWR seeks a judicial

declaration from this Court that the transactions entered into are void, or in other words, unreasonable because of market manipulation, which appears to be the same issue FERC must analyze when adjudicating each FERC filing.

Further, Powerex argues the reasonableness of the rates charged is also a gravamen of the state claims alleged in the SAC and the claims pending at FERC. Powerex indicates the district court should wait until FERC itself has spoken about market manipulation, the reasonableness of the rates, and refunds, which are intrinsically involved with the state claims in the SAC. CDWR failed to address whether a judicial decision on CDWR's claims premised on state public policy could conflict with FERC's findings involving any of the FERC filings.

## STANDARD

> A trial court may . . . find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and [it] does not require that the issues in such proceedings are necessarily controlling of the action before the court.

Leyva v. Certified Grocers of Cal. Ltd., 593 F.2d 857, 863-64 (9th Cir. 1979) (internal citations omitted).

Powerex argued at the hearing that it seeks a stay under the rationale of the Supreme Court decision in Landis v. North American Co., in which the Supreme Court stated:

> [A party seeking a stay must] make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else.

299 U.S. 248, 254 (1936).

The Ninth Circuit "set out the following framework" for evaluating the propriety of a <u>Landis</u> stay decision and its requirements for a stay in <u>Lockyer v. Mirant Corp</u>.:

> Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among those competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

398 F.3d 1098, 1110 (9th Cir. 2005)(internal citation omitted).

In <u>Leyva</u>, the Ninth Circuit also stated "[a] stay should not be granted unless it appears likely the other proceeding will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." 593 F.2d at 864. <u>Leyva</u> explains when deciding a stay motion, the court should be "cognizant" of whether "[i]t would waste judicial resources and be burdensome upon the parties if . . . discovery [is permitted], . . . pretrial proceedings [completed], and evidence . . . determine[d] [on] the merits of the case at the same time as [a concurrent proceeding] is going through a substantially parallel process." <u>Id.</u>

CDWR argues under the first <u>Landis</u> factor, if a stay is imposed it will suffer "damage" because "a stay in this case would unfairly and unnecessarily disrupt [C]DWR's ongoing discovery efforts in proceedings that have a definite and reasonable timetable . . . ." (Pl.'s Opp'n 33:8-10.)  CDWR states discovery in this case has involved "thousands of hours and dollars," "lawyers and witnesses from at least two countries, four states, and the District of Columbia," "twenty-five depositions in two different countries," and a "million

of pages of documents," and now finally, "non-expert discovery has essentially been completed."  (Pl.'s Opp'n 34:5-13, 3:11-13.)

It has not been shown, however, that the parties would have a problem preserving evidence.  The record reveals that virtually the same evidence is involved in the FERC and district court proceedings.  Further, as the Ninth Circuit stated in  CMAX, Inc. v. Hall:

> [i]f there [is a discovery] problem [created by a stay, an] application could be made in the district court to permit further discovery proceedings.  It may be that [CDWR] will be prejudiced by the delay in the sense that evidence will be obtained, or rulings made, as a result of the [FERC] proceedings, which [could] adversely affect the claims which [CDWR] asserts in the district court.  But this is not the kind of prejudice which should move a court to deny a requested postponement. If [CDWR] is prejudiced by such an eventuality it will be because the [FERC] proceedings demonstrate a weakness in its case.  And if its case is weak, justice will be served by having that fact revealed prior to the district court trial.

300 F.2d 265, 269 (9th Cir. 1962).  If FERC reaches the issue whether Powerex subjected the California Energy market to artificial manipulation on a massive scale and feigned energy crisis in the years 2000-2001, which is pending at FERC and in this district court, FERC's finding could be "helpful in deciding the district court case."  Id.

CDWR also argues that a stay would be harmful because it would cause this district court case to be pending for an unreasonable time since "there is no definite end point for the adjudication of the [Federal Powers Act]-based claims currently before FERC . . . ." (Pl.'s Opp'n 32:8-11.)  The FERC MFR, however, indicates if the California Parties prevail at FERC on their request to have the "calculation of th[e] refunds for sellers' unlawful above-the-cap sales. . . occur quickly[,] . . . [FERC would] order the sellers to immediately pay these refunds to CERS, with interest at the FERC

interest rate." (FERC MFR 11.)  Further, regardless of how long FERC

may take to adjudicate the FERC filings now before it, the proceedings

before this Court, FERC, and the Ninth Circuit have already lasted

over eight years. "[T]he subject matter of the [proceedings at FERC

and in this district court are] highly complex and it is the avoidance

of a duplication of that very complexity that serves in part to

justify the stay." Chronicle Publishing Co. v. National Broadcasting

Company, 294 F.2d 744, 749 (9th Cir. 1961).  The complex nature of the

proceedings is not disputed.  Each proceeding involves numerous energy

transactions and highly complicated issues of energy market

manipulation.  "In the case before us, the stay relates only to the

proceedings before [FERC].  If the stay, even so limited, be a

protracted one, it is only because the subject matter of the

proceedings is highly complex." Id.  These considerations favor a

stay.

Moreover, "the known facts speak for themselves in respect

[to the second factor of the Landis stay,] hardship [or inequity which

a party may suffer in being required to go forward]." Chronicle, 294

F.2d at 747.

> [When] the facts material to each examination may
> in large part be the same[,] [w]e are then
> confronted with the prospect of two tremendously
> complex proceedings simultaneously assembling the
> same factual data in painstaking detail for the
> purpose of considering these facts from different
> points of view.  The situation is one which cries
> out for the elimination of wasteful duplication of
> efforts . . . .  The elimination of unnecessary
> duplications does not appear unreasonable in these
> circumstances.  To hold otherwise might well, as a
> practical manner, defeat the very end sought . . .
> The burden of duplication of effort is not, of
> course, borne by the courts alone.  It is borne as
> well by the litigants and their counsel.

Id. at 749.  CDWR essentially asks this Court in its SAC, and asks

FERC through the FERC filings, to review and interpret the same

voluminous documents, as well as decide the same issue whether there

was market manipulation and artificial energy scarcity in the years

2000 and 2001.  Even the CAG, along with the other California Parties,

has indicated a stay is appropriate by arguing at FERC:

> [l]itigating the claims separately would not allow
> a reasoned determination of the magnitude of
> financial harm that California ratepayers suffered
> during the Crisis.  Piecemeal litigation also would
> squander the resources of [FERC] and the parties
> *(and potentially the courts)*, would create
> potentially inconsistent results, and would make it
> more difficult for the parties to discuss global
> settlements as an alternative to this
> already-protracted litigation.

(FERC MTC 5)(emphasis added).  The California Parties' argument that

"[p]iecemeal litigation . . . would squander the resources of [FERC]

and the parties (and potentially the courts), would create potentially

inconsistent results, and would make it more difficult for the parties

to discuss global settlements as an alternative to this

already-protracted litigation themselves," is persuasive and is

contrary to CDWR's position against a stay.  This argument indicates

CDWR will not suffer hardship or inequity if a stay is imposed.

Powerex argues it will suffer a hardship in the absence of a

stay, because it will be engaged in dual litigation before this court

and at FERC, and will soon try the state claims in the SAC in a trial

expected to last a month. (Def's Mot. 13:3-4.)  Powerex also argues a

stay would "prevent concurrent adjudication of the same issue in

federal court and at FERC . . . [and] reduce the potential for

inconsistent determinations concerning market manipulation or market

power exercised by Powerex or other suppliers in the California

wholesale energy markets." (Def's Mot. 13:18-14:6.)   Powerex and the

California Parties appear to agree that a stay is appropriate to avoid "hardship" that would be experienced if dual litigation were to go forward.

The third <u>Landis</u> factor is whether a stay would serve the "orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." <u>Lockyer</u>, 398 F.3d at 1110. Powerex argues a stay would "simplify or narrow the issues, evidence, and questions of law present in this case" because there is "a high likelihood that ongoing FERC proceedings will . . . grant 'make whole' monetary relief[; and if] FERC denies relief - in whole or part - . . . the scope of the transactions and the range of the issues for the Court to address will be radically narrowed, if not eliminated entirely." (Def's Reply 18:9-10, 21:13-25:13; Def's Mot. 16:6-10.) Powerex is correct. In terms of "simplifying . . . the issues or questions of law," a stay is warranted. The district court could benefit from deferring to  FERC's review and findings on the reasonableness of the rates charged. Such findings could crystalize the state questions in the SAC and allow the judicial decision to be made on a more distilled record; especially since the issues involved in both proceedings appear fraught with federal policy considerations. "[A]t the very least, the [FERC] proceeding will provide a means of developing comprehensive evidence bearing upon the highly technical [question whether Powerex subjected the California Energy market to artificial manipulation on a massive scale and feigned an energy crisis in the years 2000-2001, which is also at issue in the district court case]. <u>CMAX</u>, 300 F.2d at 269. The Ninth Circuit has stated "even under the assumption that the court is not bound and controlled

by the [concurrent proceeding's] conclusions," "findings, as well as the documents and testimony produced during the [concurrent proceeding] may be of valuable assistance to the court in resolving the . . . claims presented . . . ." Leyva, 593 F.2d at 863. Therefore, consideration of the Landis factors reveals a stay should be issued.

CONCLUSION

Accordingly, Powerex's motion for a stay is granted. This case is stayed during FERC's adjudication of the above referenced FERC filings.

Dated:  September 4, 2009

GARLAND E. BURRELL, JR.
United States District Judge